**[J-83-2022] [MO:Todd, C.J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 856 EDA 2017 |
| | : | dated July 29, 2021, reconsideration |
| v. | : | denied October 13, 2021, reversing |
| | : | the Judgment of Sentence of the |
| | : | Montgomery County Court of |
| NAZEER TAYLOR, | : | Common Pleas, Criminal Division, at |
| | : | No. CP-46-CR-0003166-2014 dated |
| Appellee | : | January 31, 2017, and remanding. |
| | : | |
| | : | ARGUED:  November 30, 2022 |

**DISSENTING OPINION**

**JUSTICE BROBSON**                    **DECIDED:  January 29, 2024**

The Majority concludes that this Court must vacate Nazeer Taylor's judgment of sentence due to a structural error and that the criminal court does not have jurisdiction to consider this matter further, such that discharge is necessary.  My disagreement with the Majority's conclusion is twofold.  First, I disagree that the error was structural; rather, I would conclude that Taylor's judgment of sentence must be vacated due to an evidentiary error that was not harmless.  Second, I would conclude that the criminal court has jurisdiction to consider Taylor's case, and I would remand this matter for the criminal court to consider whether Taylor should have been certified as an adult based on an evaluation that respects his Fifth Amendment right not to be compelled to testify against himself.[1]  If the criminal court on remand concludes that the juvenile court should not have certified

---

[1] The Fifth Amendment to the United States Constitution provides, in pertinent part:  "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

Taylor to be tried as an adult, the criminal court should order that Taylor be discharged because Taylor is no longer subject to the Juvenile Act's[2] limited jurisdiction. *See* 42 Pa. C.S. §§ 6302 (defining "child"), 6303(a)(1). Otherwise, the criminal court should reinstate Taylor's conviction. *See, e.g.*, *Commonwealth v. Lux*, 445 A.2d 185, 188 (Pa. Super. 1982) (vacating judgment of sentence and remanding for new certification hearing but noting conviction could be reinstated if juvenile is recertified). For those reasons, I dissent.

I respectfully disagree with the Majority's conclusion that the Fifth Amendment violation at issue here—*i.e.*, the certification court's improper consideration of Taylor's silence to certify him to adult criminal court—is a structural error that affects the "framework within which the trial proceeds." *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The Majority provides a robust historical background detailing the evolution of the harmless error rule that ultimately led to the United States Supreme Court's decision in *Chapman v. California*, 386 U.S. 18 (1967), wherein it reasoned that not all constitutional errors are harmful, and, thus, such errors do not *automatically* result in the reversal of a conviction. *Chapman*, 386 U.S. at 22. At issue in *Chapman* was a provision of California's state constitution that permitted a court and counsel to comment on a defendant's failure to testify and also permitted a court and a jury to consider that silence as evidence against the accused. *Id.* at 19. The defendants in the case chose not to testify in their defense, and counsel for the state commented prodigiously on their silence throughout their joint trial. *Id.* The trial court also charged the jury that it was permissible to draw inferences from the defendants' silence. *Id.* One defendant was sentenced to life imprisonment, and the other was sentenced to death. *Id.*

---

[2] 42 Pa. C.S. §§ 6301-6375.

Shortly after the defendants' trial in the *Chapman* case, the United States Supreme Court issued its decision in *Griffin v. California*, 380 U.S. 609 (1965), wherein it held that California's constitutional provision and practice of commenting on and considering a defendant's silence violated the Fifth Amendment. *Griffin*, 380 U.S. at 613. The Supreme Court of California subsequently heard the defendants' consolidated appeals in *Chapman* and, although admitting that the prosecutorial comments and jury charge regarding the defendants' silence violated the Fifth Amendment based on *Griffin*, affirmed by applying the harmless error provision in California's state constitution. *Chapman*, 386 U.S. at 20.

Reversing, the United States Supreme Court first declined to hold that all constitutional errors require an automatic reversal of conviction, observing that all 50 states had developed some form of a harmless error rule and that Congress had established that federal courts shall not reverse for "errors or defects which do not affect the substantial rights of the parties." *Id*. at 22 (quoting 28 U.S.C. § 2111). Although acknowledging that cases such as *Gideon v. Wainwright*, 372 U.S. 335 (1963) (establishing right to counsel), and *Tumey v. Ohio*, 273 U.S. 510 (1927) (requiring impartial judge), developed the axiom that there are "some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," the Supreme Court reasoned that its harmless error precedent "belie[d] any belief that all trial errors which violate the [United States] Constitution automatically call for reversal." *Chapman*, 386 U.S. at 22-23 & n.8 ("[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction.") (discussing *Fahy v. Conn.*, 375 U.S. 85 (1963) (adopting harmless error rule)). The Supreme Court stressed, however, "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that

it was harmless beyond a reasonable doubt." *Id.* at 24. The Supreme Court then adopted the harmless error standard it discussed in *Fahy*: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23 (quoting *Fahy*, 375 U.S. at 86-87). As to the Fifth Amendment violation before it, the Supreme Court found no trouble in concluding that the references to the defendants' silence were not harmless. *Id.* at 24-26 ("To reach this conclusion one need only glance at the prosecutorial comments compiled from the record . . . .").

Enlarging on the *Chapman* constitutional harmless error rule in *Fulminante*, the United States Supreme Court observed that it had applied the concept of harmless error to a "wide range" of constitutional errors, and it reasoned that "most constitutional errors can be harmless." *Fulminante*, 499 U.S. at 306-07 (citing, *inter alia*, *United States v. Hasting*, 461 U.S. 499, 509-12 (1983) (recognizing that, "[s]ince *Chapman*, the [United States Supreme] Court has consistently made clear that it is the duty of a reviewing court . . . to ignore errors that are harmless, including most constitutional violations," and holding that prosecutor's comment on defendants' failure to testify in their own defense was harmless (citations omitted)); *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (concluding that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless[ ]error analysis."); *Moore v. Illinois*, 434 U.S. 220, 232 (1977) (holding that Sixth Amendment violation concerning corporeal identification of the accused without counsel present is subject to harmless error analysis pursuant to *Chapman*)). In so doing, the Supreme Court identified a critical distinction between a "trial error," which is subject to harmless error review, and a "structural error," which requires the automatic reversal of a conviction:

> The common thread connecting [cases such as, *inter alia*, *Hasting*, *Van Arsdall*, and *Moore*,] is that each involved "trial error"—error which occurred during the presentation of the case to the jury, and which may

therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. In applying harmless[ ]error analysis to these many different constitutional violations, the Court has been faithful to the belief that the harmless[ ]error doctrine is essential to preserve the "principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error."

. . . .

The admission of an involuntary confession . . . is markedly different from the other two constitutional violations referred to in the *Chapman* footnote as not being subject to harmless[ ]error analysis. One of those violations, involved in *Gideon* . . . was the total deprivation of the right to counsel at trial. The other violation, involved in *Tumey* . . . , was a judge who was not impartial. These are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless[ ]error" standards. The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial. Since our decision in *Chapman*, other cases have added to the category of constitutional errors which are not subject to harmless error[, including] the following: unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery*, 474 U.S. 254 (1986); the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 177-178[] n.8 (1984); and the right to public trial, *Waller v. Georgia*, 467 U.S. 39, 49[] n.9 (1984). Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair."

*Fulminante*, 307-10 (quoting *Van Arsdall*, 475 U.S. at 681, and *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)).

With that distinction made clear, the *Fulminante* Court concluded that involuntary confessions or statements are a trial error subject to harmless error review:

The admission of an involuntary confession is a "trial error," similar in both degree and kind to the erroneous admission of other types of evidence. The evidentiary impact of an involuntary confession, and its effect upon the composition of the record, is indistinguishable from that of a confession obtained in violation of the Sixth Amendment—of evidence seized in violation of the Fourth Amendment—*or of a prosecutor's improper comment on a defendant's silence at trial in violation of the Fifth Amendment*. When

reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt.[3]

*Id.* at 310 (emphasis added).

Both the Superior Court and this Court have applied harmless error to a variety of constitutional violations. Most recently, in *Commonwealth v. Rivera*, 296 A.3d 1141 (Pa. 2023), we assessed whether a prosecutor's repeated comments at trial on a defendant's post-arrest, post-*Miranda* silence in violation of the defendant's constitutional right to be free from self-incrimination was harmless. *Rivera*, 296 A.3d at 1142. Concluding that the Commonwealth had not met its burden under the three-prong, harmless error test discussed in *Commonwealth v. Hairston*, 84 A.3d 657 (Pa.), *cert. denied*, 574 U.S. 863 (2014),[4] we held that the error was not harmless, reversed the Superior Court in part, and remanded for a new trial. *Rivera*, 296 A.3d at 1159-61. In *Commonwealth v. Jacoby*, 170 A.3d 1065 (Pa. 2017), *cert. denied*, 139 S.Ct. 58 (2018),

---

[3] As indicated by its rationale, in reaching its conclusion that the admission of an involuntary statement or confession is a trial error subject to harmless error review, the *Fulminante* Court appears to have relied heavily on its decision in *Hasting*, where it applied harmless error to a prosecutor's unconstitutional comment on a defendant's silence at trial. *See Hasting*, 461 U.S. at 509-12.

[4] As this Court explained in *Hairston*,

[h]armless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Hairston*, 84 A.3d at 671-72 (quoting *Commonwealth v. Hawkins*, 701 A.2d 492, 507 (1997)).

we concluded that a Fourth Amendment[5] probable cause violation concerning inadmissible evidence was harmless given the "overwhelming" evidence the police lawfully obtained. *Jacoby*, 170 A.3d at 1081-87. In *Commonwealth v. Bond*, 652 A.2d 308 (Pa. 1995), we applied harmless error to a Sixth Amendment[6] *Bruton*[7] violation and similarly overlooked the error given the overwhelming evidence identifying the defendant as the perpetrator of the crime charged. *Bond*, 652 A.2d at 313-14. And, in *Commonwealth v. Snyder*, 60 A.3d 165 (Pa. Super.), *appeal denied*, 70 A.3d 811 (Pa. 2013), the Superior Court held that the admission of an incriminating statement made without apprising the defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), was harmless given the overwhelming witness evidence against the defendant. *Snyder*, 60 A.3d at 173-75.

The recurring theme in these (and other) cases, as the United States Supreme Court similarly expressed in *Fulminante*, is the recognition that trial errors impact the presentation of the case to the fact-finder—or the trial process—rather than the "framework within which the trial proceeds." *Fulminante*, 499 U.S. at 310. Trial errors involve evidentiary issues that prejudice a defendant during trial, and they can be quantified and assessed along with the other evidence presented to determine whether the error was so prejudicial to the defendant as to necessitate a new trial. The Fifth

---

[5] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[6] The Sixth Amendment to the United States Constitution provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[7] *Bruton v. United States*, 391 U.S. 123 (1968).

Amendment violation at issue in this case falls precisely in that category. The certification court, sitting as fact-finder, considered Taylor's silence as evidence that he could not be rehabilitated in disregard of the evidence Taylor presented to the contrary. Had there been other overwhelming evidence to support the certification court's ruling that Taylor could not be rehabilitated, an appellate court could clearly conclude that the certification court's error was harmless. The mere fact that an error is egregious does not compel a determination that the error is structural in nature.

If the form of the error is not enough to drive this point home, *Hasting*, *Chapman*, and *Rivera* provide manifest support that this is a trial error. Each case concerned the impermissible consideration at trial of a defendant's silence, and this Court and the United States Supreme Court assessed those errors under a harmlessness standard to determine whether a new trial was warranted. As this Court has time and again recognized, "[t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt." *Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012) (alteration in original), *cert. denied*, 569 U.S. 972 (2013) (quoting *Commonwealth v. Thornton*, 431 A.2d 248, 251 (Pa. 1981)). Its purpose is predicated on the notion that a "defendant is entitled to a fair trial but not a perfect one." *Id.* (quoting *Thornton*, 431 A.2d at 251). To avoid undermining these principles and upsetting established harmless error precedent that both the United States Supreme Court and this Court have developed, I would conclude that the violation of Taylor's Fifth Amendment right against self-incrimination is a trial error subject to harmless error review.

Despite my difference of opinion as to the nature of the error before us, applying the harmless error framework discussed in *Hairston* makes clear beyond a reasonable

doubt that the certification court's error here was not harmless. *See Hairston*, 84 A.3d at 671-72. First, the certification court's comments on Taylor's silence were not a "slip-of-the-tongue affair;" rather, the certification court commented repeatedly on Taylor's silence as the *primary reason* to certify Taylor to adult criminal court. (*See* N.T., 04/25/2014, at 113-15);[8] *Rivera*, 296 A.3d at 1149. "Such a machine-gun repetition of a denial of constitutional rights, designed and calculated to make [Taylor's] version of the evidence worthless," clearly effected significant prejudice against him. *Chapman*, 386 U.S. at 26. Second, there was no other evidence presented at the certification hearing that could be compared to Taylor's silence to suggest his silence was merely "cumulative" of the other evidence that was considered—*i.e.*, this was one-of-a-kind evidence that penalized Taylor for exercising a constitutional privilege. *See Griffin*, 380 U.S. at 614. Lastly, Taylor submitted the testimony of a licensed clinical psychologist

---

[8] The certification court reasoned from the bench, in relevant part:

> And they won't admit that he's committed the sex offense, and that's sort of their conundrum, because time is of the essence. He's approaching 18 years old. The act -- you can argue degree of sophistication all you want, but it was a predatory damaging act that occurred repeatedly over a 1-year period of time.
>
> If you're going to go on the sex offenders' treatment, it's important that you admit, No. 1; examine your triggers, No. 2; talk about how you can avoid your triggers; and identify up-front the depth of the problem. And here, we can't identify the depth of the problem largely because we're not admitting yet that there is a problem.
>
> What if he were to sit there for a year and a half before he finally admitted that he did something? . . .
>
> . . . . And that's the very issue, though, is he amenable to sex offenders' treatment? And, in the juvenile system, time is running out. As I said, there is only a few years left, and the depth -- and if he doesn't make sufficient progress, he's 21, he's back on the streets, and he's released from the jurisdiction of the Court with no supervision at all. That's the dilemma.

(N.T., 04/25/2014, at 113-15.)

who suggested that Taylor was far from incorrigible in reasoning that "he could certainly be treated" within the juvenile system and would be subject to juvenile supervision for the following three years. (N.T., 04/25/2014, at 14-22.) It, therefore, cannot be said with confidence that absent the Fifth Amendment violation Taylor, nevertheless, would have been certified to adult criminal court. Thus, in my view, there is more than "a reasonable possibility that the evidence complained of . . . contributed" to Taylor's certification. *Chapman*, 386 U.S. at 23 (quoting *Fahy*, 375 U.S. at 86-87).

I also respectfully disagree with the Majority's position that a remand to criminal court is not possible in this case because the criminal court lacks jurisdiction. Article V, Section 5 of the Pennsylvania Constitution and Section 931(a) of the Judicial Code, 42 Pa. C.S. § 931(a),[9] instill unlimited jurisdiction in the courts of common pleas. Thus, under the novel facts of this case, and where Juvenile Act jurisdiction is not applicable, the criminal court must be able to assert its jurisdiction to consider Taylor's case on remand. Indeed, it appears to me to be precisely the reason for that unlimited jurisdiction in the Pennsylvania Constitution and our statutory law.[10] That interpretation is also consistent with *Commonwealth v. Armolt*, 294 A.3d 364 (Pa. 2023), where we held that a criminal court had jurisdiction to try and convict an adult who committed an offense as a juvenile. *Armolt*, 294 A.3d at 371-74. As noted, Taylor is currently an adult who committed an offense as a juvenile; thus, it follows that the criminal court has jurisdiction

---

[9] Section 931(a) of the Judicial Code provides: "Except where exclusive original jurisdiction of an action or proceeding is by statute or by general rule . . . vested in another court of this Commonwealth, the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings . . . ."

[10] Article V, Section 5 of the Pennsylvania Constitution provides:

There shall be one court of common pleas for each judicial district . . .

(b) having unlimited original jurisdiction in all cases except as may otherwise be provided by law.

under Article V, Section 5 and Section 931 to consider whether Taylor should have been certified to criminal court.

Given the unique factual posture of this case, moreover, neither *Commonwealth v. Johnson*, 669 A.2d 315 (Pa. 1995), relied upon by the Majority, nor *Commonwealth v. Greiner*, 388 A.2d 698 (Pa. 1978), discussed in *Johnson*, stands for the proposition that jurisdiction cannot vest in criminal court for an aged-out juvenile offender. *Johnson* concerned the transfer of a juvenile from *criminal* to *juvenile* court, and its rationale focused on the appealability of that interlocutory transfer order in consideration of double jeopardy concerns and the desire to avoid placing a juvenile through multiple trials in different courts. *See Johnson*, 669 A.2d at 322-23. In *Greiner,* this Court concluded that the certification of a juvenile from juvenile to criminal court was improper under the circumstances presented in that case. *Greiner*, 388 A.2d at 702. As a result, we vacated the juvenile's sentence and remanded the case to juvenile court for a new certification hearing. *Id*. At the time of that disposition, however, the juvenile was under the age of 21 and subject to Juvenile Act jurisdiction. *Id*. at 699 n.1. Because Taylor is no longer subject to Juvenile Act jurisdiction, the facts of *Johnson* and *Greiner* are clearly distinct, and our more recent rationale in *Armolt* provides a stronger foundation for directing the outcome of this case.

Furthermore, as explained in *Johnson*, if a juvenile is convicted of murder or other violent offenses excluded from the definition of "delinquent act" under Section 6302 of the Juvenile Act, the juvenile is initially subject to criminal court treatment. Criminal courts, however, are empowered to conduct decertification hearings pursuant to Section 6322(a). In a decertification hearing, a criminal court considers whether transferring a juvenile from criminal to juvenile court is in the public interest. 42 Pa. C.S. § 6322(a). To make that determination, criminal courts apply the public interest and rehabilitative factors in

Section 6355(a)(4)(iii) of the Juvenile Act, which are the *same factors* that a juvenile court considers when determining whether to certify a juvenile to criminal court. What this shows is that criminal courts have the ability and experience to consider adequately whether an offender—either juvenile or adult—is entitled to juvenile or criminal consideration and treatment. Accordingly, upon remand in this case, the criminal court could clearly consider whether Taylor should have been certified to criminal court at his initial certification hearing.

In short, I would reverse the Superior Court's entry of judgment, vacate the criminal court's entry of judgment, and remand this matter to the criminal court for a consideration of whether, applying the criteria in a manner that respects Taylor's Fifth Amendment right, certification to criminal court was proper in this case. A remand puts Taylor as close as possible to the position he was in before the Fifth Amendment violation, and it gives him a free and fair opportunity to contest his certification. If the criminal court determines the certification was proper, it should reinstate Taylor's conviction. Otherwise, the criminal court should discharge Taylor.

As a final matter, in my brief time on this Court, I have encountered three separate cases dealing with aged-out juvenile offenders—*i.e.*, offenders who committed crimes as juveniles but either by delay of prosecution or, as in the current case, the passage of time due to an appeal, the offender is no longer subject to the Juvenile Act's limited jurisdiction. *See Armolt*, *supra*; *Commonwealth v. Renninger*, 302 A.3d 95 (Pa. 2023) (denying petition for allowance of appeal). In my view, these cases raise significant and troubling constitutional and procedural issues, and the Juvenile Act is silent with respect to the handling of such offenders. Given the complexity these cases present and the lack of clarity in the Juvenile Act as to how courts are meant to handle aged-out juvenile offenders, this Court has struggled to reach a consensus on how to provide an appropriate

remedy.  I, therefore, urge the General Assembly to take up this issue and provide much needed clarity.  As noted by the Majority, other jurisdictions have crafted a solution to this problem through legislation, which may provide a starting point for the General Assembly. *See* Majority Op. at 56.

For all of the foregoing reasons, I dissent.